# In the United States Court of Federal Claims

No. 16-272T
Filed: March 5, 2020

| | |
|---|---|
| **AT&T ADVERTISING, L.P.,**<br>**YP ADVERTISING & PUBLISHING LLC,**<br>Tax Matters Partner,<br><br>    *Complainant,*<br><br>v.<br><br>**UNITED STATES,**<br><br>    *Defendant.* | **Keywords:** Tax; RCFC 56; 26 U.S.C. § 6226; 26 U.S.C. § 199; I.R.C. § 1.199-3; Advertising Income; Benefits and Burdens of Ownership; *ADVO, Inc. v. Commissioner*, 141 T.C. 298 (2013); *Meredith Corp. v. United States*, 405 F.Supp. 3d 795 (S.D. Iowa 2019). |

*Dwight N. Mersereau*, with whom were *Robert L. Willmore*, *Teresa M. Abney*, and *Carina C. Federico*, Crowell & Moring LLP, Washington, D.C., for Complainant.

*Bart D. Jeffress*, with whom were *Karen E. Servidea*, *Katherine Powers*, and *David I. Pincus*, United States Department of Justice, Tax Division, Court of Federal Claims Section, Washington, D.C., and *Richard E. Zuckerman*, Principal Deputy Assistant Attorney General, for Defendant.

## OPINION AND ORDER

**TAPP, Judge.**

  Before the Court in this partnership-level tax adjustment suit are the parties' cross-motions for summary judgment. On February 26, 2016, Complainant, AT&T Advertising, L.P. ("AT&T"), YP Advertising & Publishing, LLC, Tax Matters Partner (collectively "the Partnership"),[1] filed its Complaint seeking readjustment of partnership items for tax years 2005–2009, pursuant to Section 6226 of the Internal Revenue Code of 1986. (*See* Compl., ECF No. 1). Discovery closed on February 26, 2019. On June 28, 2019, Defendant, the United States, filed a Motion for Summary Judgment. (Def.'s Mot. for Summary Judgment, ECF No. 68). On July 1, 2019, the Partnership filed a Motion to Strike Defendant's Motion for Summary Judgment (ECF No. 72), which was summarily denied on July 17, 2019, (ECF No. 75). On August 30, 2019, the Partnership filed its Response and Cross-Motion for Summary Judgment. (Complainant's Resp. and Cross-Motion for Summary Judgment, ("Cross-Mot."), ECF No. 78). On November 18, 2019, the United States filed its Reply and Response. (Def.'s Reply and Resp., ("Def.'s Reply"), ECF No. 90). On January 14, 2020, the Partnership filed its Reply. (Complainant's Reply, ECF

---

[1] The Complaint advises that "[s]ubsequent to the taxable years in issue, [AT&T Advertising, L.P.] merged with and into YP Advertising & Publishing LLC." (Compl. at 1).

No. 96). On February 20, 2020, the Court heard oral arguments on the cross-motions for summary judgment. This matter is now fully briefed and ripe for decision.

For the reasons set forth below, the Court **DENIES** the parties' cross-motions for summary judgment.

## I.  Background

During tax years 2005 through 2009, the Partnership was in the business of publishing and distributing "Yellow Pages" telephone directories ("Yellow Pages" or the "Directories"), which are distributed to residents and businesses at no charge. (Cross-Mot. at 8; Compl. at 4). The Directories primarily contained advertisements that the Partnership sold to business customers. (Cross-Mot. at 8). In tax years 2005 to 2009, the Partnership claimed a tax deduction related to advertising revenue pursuant to 26 U.S.C. § 199 (repealed 2017). (Compl. at 7–11).

The process of publishing the Directories involved several steps: pre-press, press, and post-press. (*See* Cross-Mot. at 8–18). During the pre-press stage, the Partnership sold advertising space in the Directories. (Def.'s Mot. for Summary Judgment, Ex. B at 1718:12–1719:18 (Comfort Dep.), B1839 (pre-printing activities flow-chart)).[2] The Partnership would either develop advertisements for the clients or use client-provided advertisements. (C2241:20–2244:15, 2247:5–2249:21, 2250:4–2255:33 (Taylor Dep.)). Once the advertisements were developed, the Partnership would use specialized software to design and create each page of the Directory as it would appear in the final product. (C2256:20–2257:22, 2258:23–2261:11, 2263:6–20 (Taylor Dep.); C2196:20–2197:15 (Comfort Dep.)). Ultimately, this resulted in the creation of an electronic file, typically a PDF file, which the Partnership submitted to contract printers for press and post-press services.[3] (C2108 (receipt of PDF file transmission); C2130; C2273:18–2274:13 (Skwara Dep.); C2301:15–2303:26 (Velasco Dep.); C2263:6–20; C2198:14–22; C2344:17-2345:27 (Arnold Dep.)). The Partnership used a variety of different methods to transfer the files to the contract printers, including as files on CD-ROMs and Zip Disks, on film,[4] as well as over a dedicated network. (C2264:16–2265:12 (Taylor Dep.); C937–38 (Contract No. 484-A between the Partnership and R.R. Donnelly & Sons Co.), 1051–52; C1379–80 (Contract No. 0504 between the Partnership and R.R. Donnelly & Sons Co.); C2108; C2130).

The Partnership used two different contract printers for the press and post-press phases: R. R. Donnelley & Sons Co. ("RRD"), and Quebecor World Inc. (USA) ("QWI") (collectively "the Printers"). (C2108; C2130; C2273:18–2274:13; C2301:15–2303:16; C2263:6–20; C2198:14–22; C2344:17–2345:17). The Partnership executed three contracts and amendments with RRD: (1) C282F (B0001–625); (2) 484-A (B0626–1040); and (3) 0504 (B1113–1404); and two contracts and amendments with QWI: (1) 455-A (B1453–1642); and (2) SAL (B1417–

---

[2] Unless otherwise noted, citations to Defendant's Appendix B in its opening brief will be in the form of "B[bates number or range]." Similarly, citations to Complainants' Appendix C in its Cross-Motion for Summary Judgment will be in the form of "C[bates number or range]."

[3] The precise content of these files is an area of significant dispute between the parties.

[4] The Court uses "film" to refer generally to paper positives, film positives, and film negatives.

1452). The contracts with RRD stated that RRD would provide "Materials and Services" or "Printing Services." (B0004; B0626; B1113). The contracts with QWI provided for "Production (printing, paper, bindery and packaging) of Advertising Tabs," or "Materials and Services" associated with the "Printing of Subscriber Directories." (B1417; B1453).

Pursuant to these contracts, the Printers created printing plates based on the files provided by the Partnership, mounted those plates on presses which transposed the content of those files onto paper, and bound the Directories into individual books. (C2273:18–2274:13, 2276:24–2278:3 (Skwara Dep.); C2439:3–2442:4 (Steinbach Dep.)). The Printers were not permitted to alter any content in the Directories; if there was an error in any of the content, the Partnership corrected the error and provided the contract printers with a new file. (C2266:16–2267:25 (Taylor Dep.)). Under the contracts with RRD, the Partnership was required to provide both the electronic files and a hard copy that "should match information contained on the [electronic] file." (B0717, 831, 1231).

Separately, the Partnership negotiated and executed paper supply contracts with numerous paper mills to supply the paper used in the Directories, which established, *inter alia*, the amount and price of the paper to be supplied, the specifications of the paper, and delivery locations. (C1895–1982; C1783–1894; C2213:14–2214:7 (Comfort Dep.); C2279:16–2281:10 (Skwara Dep.); C2364:17–2366:3 (Arnold Dep.)). Neither RRD nor QWI were parties to the paper supply contracts but the Partnership designated the Printers as authorized to place paper orders on behalf of the Partnership and to pay the invoices for such orders. (C1786; C1898; C2209:23–2210:21 (Comfort Dep.); C2279:16–2281:10 (Skwara Dep.)).

Under the printing contracts between the Partnership and RRD, title to the paper vested with the Partnership once the paper was delivered to a printer. (C1916; C1809). The Partnership warranted to RRD that the paper would be free from defects in material and workmanship and would conform to the specifications provided by the Partnership to the paper mills. (C862–63; C1288–89). If substandard or defective paper was delivered by a paper mill, RRD was required to provide notice to the Partnership, and the Partnership would determine whether to use the paper and would reimburse RRD for any extra costs resulting from the use of substandard or defective paper. (C862–64; C1288–90; *see also* B1469 (similar provision in QWI contract 455-A)).

Under the contracts between the Partnership and the Printers, the Partnership retained title to the files that it transmitted to the Printers, all the content in the Directories (including the intellectual property in the Directories), and the copyrights to the Directories and content therein. (C252; C871, 970; C1302; C1614–15; C2124–27; C2128–29; C2209:5–22 (Comfort Dep.)). Thus, the Partnership owned the Directories, the content of the Directories, the electronic files, the paper on which the Directories were printed, the intellectual property contained in the Directories, and the copyrights to the Directories and their content. (C252; C871; C1302; C1614–15).

Under the contracts with the Printers, the Partnership had the sole right to use the Directories. (C252; C871–72, 970; C1302–03; C1614–15). The Printers had no right to use the Directories, make copies of the Directories for their own use, or dispose of the Directories in any

manner other than as directed by the Partnership. (C252; C871–72, 970; C1302–03; C1614–15). In addition, the Partnership could modify the production schedule for the Directories and, if it did, the Partnership was required to compensate the Printers for any overtime required to meet the changed schedule, provided that such overtime was approved by the Partnership. (C2358:18–C2363:3 (Arnold Dep.); C246; C861, 865–66; C1287; C1605–06). The Partnership also had the contractual right to send representatives to enter and inspect the Printers' premises and observe their performance to ensure that the Printers adhered to the Partnership's quality standards. (C237; C856; C866–67, 69, 963–64; C1280; C1293, 1297; C1591, C1600–01; C1609; C2203:7–2206:11, 2207:4–2208:10, 2224:25–2228:17 (Comfort Dep.); C2356:8–2357:4 (Arnold Dep.); C2446:13–18 (Steinbach Dep.)).

Pursuant to QWI contract PBD-455-A, the Partnership agreed to reimburse QWI for the cost of the printing presses and binding equipment it purchased in order to perform press and post-press services for the Partnership. (C1595–96, 1614, 1621, 1663–64, 1690, 1706–07, 1710, 1729, 1767; C2284:10–18, C2285:10–2287:16, C2289:6–2290:20, C2296:4–12 (Skwara Dep.); C2447:22–2450:21 (Steinbach Dep.); C2222:6–2223:24 (Comfort Dep.)). There were two components to this reimbursement. One component, the equipment dedication charge, allowed for QWI's recovery of capital costs, which expired at the completion of that recovery. The Partnership was required to pay the full equipment dedication charge even if it terminated the contract. (C1614, 1706–07). The other component, the base dedication charge, covered overhead costs related to the equipment and remained in effect throughout the life of the contract. (C1706–07).

The contracts between the Partnership and the Printers provided that the Partnership was financially responsible for all taxes imposed on the Directories and the paper used to print the Directories. (C250; C870; C968–69; C1074–75; C1300–01; C1613). The contracts with RRD specifically referenced personal property taxes. (C968; C1300–01).

The Printers were required to carry insurance to cover, *inter alia*, property damage, and were required to provide the Partnership with certificates of insurance showing that insurance was in place. (C238; C856–57, 959–60, 1071–73, 1095–96; C1280–81; C1570, 1576–77, 1583–84, 1586–88; C1601; C1726–27; C1899–1800; C1908–09). Under some of the contracts, the Printers were required to include AT&T as an "additional insured" under the insurance policies. (C959–60; C1072, 1097; C1281; C1577, 1583; 1588; C1693; C1726–27; C1765, 1800, 1908, 1938, 1956).

To the extent the Printers committed an error or omission with respect to the Directories that required the Partnership to reimburse part or all of an advertiser's advertising fees, the Printers were obligated to reimburse the Partnership at fixed amounts: $5,000 in the case of RRD; and $2,000 in the case of QWI. (C237; C871; C1302; C1614).

The contracts provided for monthly or quarterly ink price adjustments to reflect changes in the market price of ink. (C256–262, 276; C855, 958–59; C1279–80; C1598). The fees the Printers received for press and post-press services were subject to an annual labor cost adjustment under which the fees (not including any raw material costs) would be increased by a

4

fixed percentage of the applicable consumer price index measure. (C245–46; C858, 960–61; C1283; C1607).

Between tax years 2005–2009, the Partnership reported almost $10 billion in gross receipts from the sale of advertisements placed in the Directories. (C20, C28, C36, C44, C52, C83; C110; C143; C178; C217). The pre-press printing costs, including overhead allocated pursuant to I.R.C. § 263A, totaled approximately $824 million. (C2153–64; C2165–68; C2169–75). The Partnership spent approximately $638 million on the paper used to print the Directories and paid the Printers approximately $620 million for press and post-press services. (C2153–64; C2165–68; C2169–75).

For tax years 2005 to 2009, the Partnership claimed a § 199 domestic production deduction for its publications. The Partnership reported qualified production activities income (QPAI) of $1,122,369,674 in tax year 2005; $1,223,040,223 in tax year 2006; $1,153,666,254 in tax year 2007; $1,039,335,596 in tax year 2008; and $941,198,318 in tax year 2009. (Compl. at 7–11). During most of that time period, the Printers also claimed the deduction. RRD claimed the § 199 deduction for tax years 2005, 2006, 2007, and 2009, but did not claim the deduction for tax year 2008 because it did not have taxable income. (B2408:7–2416:9, B2461:8–2463:16, B2463:21–2465:6 (Weicher Dep.); B2475–80; B2551–52; B2553–54). QWI's parent company, QWI Printing Holding Company, claimed the deduction for tax years 2005, 2006, and 2007. (B2587:21–2596:9 (Palmisano Dep.); B2629–30; B2648; B2695; B2715; B2758:2–2759:22, B2760:22–2761:3, B2763:8–2766:8 (Lawler Dep.); B2814; B2830).

In November 2015, the IRS issued Notices of Final Partnership Administrative Adjustment (FPAA) concerning the Partnership's tax returns for years 2005 through 2009. The IRS disallowed the § 199 deductions explaining that the Partnership failed to establish that the qualified production property (QPP)—i.e., the Directories—were manufactured, produced, grown and/or extracted by the Partnership within the meaning of I.R.C. § 199. (Redacted Exhibits to Complaint, ECF No. 14 at 9, 17, 25, 33, 41). On February 26, 2016, the Partnership filed the present suit. (Compl. at 1).

## II.    Standard of Review

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." RCFC 56(a). A "genuine dispute" exists where a reasonable factfinder "could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Material facts" are those which might significantly alter the outcome of the case; factual disputes which are not outcome-determinative will not preclude summary judgment. *Id*. The moving party bears the initial burden of proof, but this burden may be discharged by showing the absence of evidence supporting the opposing party's claim. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

In determining whether summary judgment is appropriate, the court should not weigh the credibility of the evidence, but simply "determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. When both parties move for summary judgment, "the court must evaluate each party's motion on its own merits, taking care in each instance to draw all

reasonable inferences against the party whose motion is under consideration." *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1391 (Fed. Cir. 1987). "The fact that both parties have moved for summary judgment does not mean that the court must grant judgment as a matter of law for one side or the other." *Id.* "To the extent there is a genuine issue of material fact, both motions must be denied." *Marriott Int'l Resorts, L.P. v. United States*, 586 F.3d 962, 969 (Fed. Cir. 2009).

### III.  Discussion

Congress enacted 26 U.S.C. § 199 in 2004 (Pub. L. No. 108-357, § 102) and repealed it in 2017 (Pub. L. No. 115-97 (2017), Title I, § 13305(a) & (c)). The purpose of § 199 was to encourage investment in domestic manufacturing facilities and the creation and preservation of U.S. manufacturing jobs. *See* H.R. Rep. No. 108-548 (I), at 115 (2004). In general, § 199 allows a deduction equal to a percentage of the lesser of either a taxpayer's (1) QPAI, or (2) taxable income.[5] 26 U.S.C. § 199(a), (d)(2). For tax years beginning in 2005 or 2006, the deduction was equal to 3 percent, and for tax years beginning in 2007, 2008, or 2009, the deduction equaled 6 percent. § 199(a)(2) (2005).

QPAI is a taxpayer's domestic production gross receipts (DPGR), less related costs of goods sold and other expenses, losses, and deductions. *See* § 199(c)(1). DPGR includes gross receipts derived from any "disposition of qualified personal property (QPP) which was manufactured, produced, grown, or extracted [("MPGE")] by the taxpayer in whole or in significant part within the United States . . . ." § 199(c)(4)(A)(i)(I). QPP is tangible personal property, any computer software, and sound recordings. § 199(c)(5).[6] Thus, to have DPGR, a taxpayer must MPGE tangible personal property, computer software, or sound recordings. § 199(c). Furthermore, "the taxpayer must have the benefits and burdens of ownership of the QPP . . . during the period the MPGE activity occurs" and "only one taxpayer may claim the deduction." I.R.C. § 1.199-3(e)(1), (f)(1).

Here, the Partnership identified the Directories as QPP. (*See* Compl. at 4; Cross-Mot. at 1). In its Motion for Summary Judgment, the United States argues that the Partnership did not MPGE the Directories because "[p]ursuant to contracts between [the Partnership] and [the Printers], the Printers MPGE the [D]irectories using electronic files or tangible items (e.g., film) that contained content (e.g., ads) and the layout of directory pages and were provided by [the Partnership]." (Def.'s Mot. for Summary Judgment at 1). According to the United States, because the Partnership's pre-press activities resulted in only the creation of an electronic file, rather than tangible Directories, the Partnership did not MPGE QPP. (*Id.* at 1, 14–17). In addition, the United States argues that the Printers, rather than the Partnership, had the benefits

---

[5] For individuals, "adjusted gross income" could be used rather than taxable income. 26 U.S.C. § 199(a), (d)(2).

[6] Tangible personal property is defined as "any tangible property other than land, real property . . . , and [computer software, sound recordings, qualified film, electricity, natural gas, or potable water]." I.R.C. § 1.199-3(j)(2)(i). Computer software is defined as "any program or routine or sequence of machine-readable code that is designed to cause a computer to perform a desired function or set of functions . . . ." § 1.199-3(j)(3)(i). Apart from one exception not relevant here, computer software is "not treated as tangible personal property regardless of whether [it is] affixed to a tangible medium. However, the tangible medium to which such property may be affixed . . . is tangible personal property." § 1.199-3(j)(2)(i).

and burdens of ownership (B&BO) of the Directories such that the Printers are considered to have MPGE'd them. (*Id.* at 1, 18–50).

The Partnership, on the other hand, argues that the electronic files it provided to the Printers were either tangible personal property or computer software. (Cross-Mot. at 2–3). The Partnership also contends that because its pre-press activities were substantial in nature, it should be deemed to have MPGE'd the Directories in whole or in significant part. (*Id.* at 22–33). The Partnership moved for summary judgment on this aspect only. (*See id.* at 57). In addition, the Partnership maintains that it qualifies for the 20% safe harbor test found in I.R.C. § 1.199-3(g)(3) such that it should be deemed to have MPGE'd the Directories in whole or in significant part. (*Id.* at 33–38). Finally, the Partnership argues that it, not the Printers, had the B&BO of the Directories while the Printers performed press and post-press services. (*Id.* at 38–60).[7]

As explained below, the Court finds a genuine dispute of material fact as to the classification of the electronic files, which precludes summary judgment in favor of the Partnership. Furthermore, there exists a genuine dispute of material fact as to the B&BO issue, which precludes summary judgment in favor of the United States.

      a. *Classification of Electronic Files as Tangible Personal Property, Intangible Property, or Computer Software*

The parties disagree about what was contained in the electronic files the Partnership sent to the Printers and whether those files caused the printing presses to perform any functions such that the files could be considered computer software. The classification of the electronic files as tangible personal property, intangible property, or computer software is essential to the Partnership's argument that it MPGE'd the QPP "in whole or in significant part" through its pre-press activities under either the "substantial in nature" or "safe harbor" provisions in § 1.199-3(g)(2) and (3), and similarly, is essential to the United States' argument that the Partnership did not MPGE QPP at all.[8] *See* § 1.199-3(g)(2), (3). In making their respective arguments, the parties

---

[7] At oral argument, the Partnership renewed its motion to strike Defendant's motion for summary judgment, again arguing that the United States failed to specifically identify and list all "undisputed facts." (*See also* Cross-Mot. at 18–19) (raising this same argument)). The Court declined to revisit the issue and, accordingly, denied the motion.

[8] Subsection (2) of paragraph (g), the "substantial in nature" provision, provides in relevant part:

> QPP will be treated as MPGE in significant part by the taxpayer within the United States for purposes of paragraph (g)(1) of this section if the MPGE of the QPP by the taxpayer within the United States is substantial in nature taking into account all of the facts and circumstances, including the relative value added by, and relative cost of, the taxpayer's MPGE activity within the United States, the nature of the QPP, and the nature of the MPGE activity that the taxpayer performs within the United States. The MPGE of a key component of QPP does not, in itself, meet the substantial-in-nature requirement with respect to the QPP under this paragraph (g)(2).

I.R.C. § 1.199-3(g)(2). Subsection (3) of paragraph (g), the "safe harbor" provision, provides in relevant part:

> A taxpayer will be treated as having MPGE QPP in whole or in significant part within the United States for purposes of paragraph (g)(1) of this section if, in connection with the QPP,

7

rely heavily on expert witness testimony and dispute the opposing witnesses' characterization of the electronic files and description of the interaction between those files and the printing presses. (*See* Cross-Mot. at 10, 22, 30–31; Def.'s Reply at 9–15). This means that to decide the issue, the Court would need to weigh the credibility of evidence, which is inappropriate at the summary judgment stage. *See Anderson*, 477 U.S. at 249 (1986). Therefore, because there exists a genuine dispute of material fact as to the classification of the electronic files, the Court must deny the parties' motions for summary judgment on this issue.

Although the classification of files during an intermediate stage in the production process is relevant to the application of § 1.199-3(g)(2) and (3), it is not relevant to whether the Partnership or the Printers MPGE'd the Directories under subsection (g)(1). Under subsection (g)(1):

> QPP must be MPGE in whole or in significant part by the taxpayer and in whole or in significant part within the United States to qualify under section 199(c)(4)(A)(i)(I). If a taxpayer enters into a contract with an unrelated person for the unrelated person to MPGE QPP for the taxpayer and the taxpayer has the benefits and burdens of ownership of the QPP . . . during the period the MPGE activity occurs, then . . . the taxpayer is considered to MPGE the QPP under this section.

I.R.C. § 1.199-3(g)(1); *see also* § 1.199-3(f)(1).[9]

Here, the relevant QPP was the Directories and the Partnership earned revenue from selling advertisements in those Directories. (*See* Compl. at 4). There is no dispute that the Partnership entered into contracts with the Printers for the Printers to MPGE the tangible Directories through the Printers' press and post-press activities. (*See* Def.'s Mot. for Summary Judgment at 2–7, 15; Cross-Mot. at 2, 3 ("AT&T retained title to the QPP while the contract printers further manufactured the QPP into hard-copy Directories")). Accordingly, under § 1.199-3(g)(1), if the Partnership bore the B&BO of the Directories while the Directories were being produced by the Printers, then the Partnership will be considered to have MPGE'd the Directories for purposes of § 199. Thus, the classification of the files that the Printers used to

---

> the direct labor and overhead of such taxpayer to MPGE the QPP within the United States account for 20 percent or more of the taxpayer's [cost of goods sold] of the QPP, or in a transaction without [cost of goods sold] account for 20 percent or more of the taxpayer's unadjusted depreciable basis (as defined in paragraph (g)(3)(iii) of this section) in the QPP. For taxpayers subject to section 263A, overhead is all costs required to be capitalized under section 263A except direct materials and direct labor.

§ 1.199-3(g)(3).

[9] The United States argues extensively that I.R.C. § 1.199-3(g)(2) and (3) do not apply because the Partnership did not MPGE QPP and cites to § 1.199-3(f)(1). (*See* Def.'s Mot. for Summary Judgment at 18–19). The United States relies on the examples provided in section (f) in arguing for the consideration of certain factors under the B&BO analysis, but does not substantively address the impact of section (f)(1), which provides that when a taxpayer enters into a contract with an unrelated person for the unrelated person to MPGE QPP for the taxpayer, then the taxpayer that has the B&BO is treated as having MPGE'd the QPP.

MPGE the Directories during the press and post-press stages is irrelevant, so long as the Printers MPGE'd the Directories for the Partnership pursuant to a contract.[10] *See* § 1.199-3(g).

The "Advertising Income" provision set forth in § 1.199-3(i)(5) illustrates and reinforces this conclusion. This section provides, in relevant part:

> **Exceptions**—(A) Tangible personal property. A taxpayer's gross receipts that are derived from the lease, rental, license, sale, exchange, or other disposition of newspapers, magazines, *telephone directories*, periodicals, and other similar printed publications that are MPGE in whole or in significant part within the United States *include advertising income from advertisements placed in those media*, but only if the gross receipts, *if any*, derived from the [disposition] of the newspapers, magazines, telephone directories, or periodicals are (*or would be*) DPGR.

I.R.C. § 1.199-3(i)(5)(ii)(A) (emphasis added).[11] Two of the examples provided in this section are particularly relevant here:

> **Example 1**. X MPGE, and sells, newspapers within the United States. X's gross receipts from the newspapers include gross receipts derived from the sale of newspapers to customers and payments from advertisers to publish display advertising and classified advertisements in X's newspapers. X's gross receipts described above are DPGR derived from the sale of X's newspapers.
>
> **Example 2.** The facts are the same as in Example 1 except that X disposes of the newspapers free of charge to customers, rather than selling them. X's gross receipts from the display advertising or classified advertisements are DPGR.

---

[10] I.R.C. § 1.199-3(g)(4) provides:

> **Special rules—(i) Contract with an unrelated person.** If a taxpayer enters into a contract with an unrelated person for the unrelated person to MPGE QPP within the United States for the taxpayer, and the taxpayer is considered to MPGE the QPP pursuant to paragraph (f)(1) of this section, then, for purposes of the substantial-in-nature requirement under paragraph (g)(2) of this section and the safe harbor under paragraph (g)(3)(i) of this section, the taxpayer's MPGE or production activities or direct labor and overhead shall include both the taxpayer's MPGE or production activities or direct labor and overhead to MPGE the QPP within the United States as well as the MPGE or production activities or direct labor and overhead of the unrelated person to MPGE the QPP within the United States under the contract.

Thus, if the taxpayer is deemed to have MPGE'd the QPP pursuant to a contract with an unrelated person under section (f)(1) and bears the B&BO of the QPP, thereby satisfying section (g)(1), there is no need to separately analyze subsections (g)(2) and (g)(3).

[11] Apart from arguing that § 1.199-3(i) rejects the notion that software provided on a tangible medium or via download is tangible property, (*see* Def.'s Reply at 9), the United States does not otherwise address section (i)(5).

§ 1.199-3(i)(5)(iii).

These examples, particularly Example 2, describe the Partnership's activities with respect to the Directories. The Partnership received payments from advertisers to publish advertisements in the Directories, distributed the Directories free of charge to customers, and claimed the gross receipts from the display advertising as DPGR. The only difference between the Partnership's actions and the examples provided in § 1.199-3(i)(5)(iii) is that, in the examples, the taxpayer MPGE'd the QPP itself, rather than contracting with an unrelated person.

That the Partnership contracted with an unrelated person to complete the MPGE of the Directories does not change the analysis or applicability of this section. As explained above, under § 1.199-3(g)(1), if the taxpayer enters into a contract with an unrelated person for the MPGE of QPP and the taxpayer has the B&BO during the MPGE period, then the taxpayer is deemed to have MPGE'd the QPP. Thus, the classification of the electronic files created during the pre-press stage is irrelevant, for purposes of § 1.199-3(g)(1), so long as the Partnership had the B&BO during the MPGE period.

### b. Benefits and Burdens of Ownership

Turning to the B&BO analysis, it should be noted that neither 26 U.S.C. § 199 nor I.R.C. § 1.199-3 provide a method for determining which entity bears the benefits and burdens of ownership, apart from references to "applicable Federal income tax principles during the period the MPGE activity occurs," in § 1.199-3. *See* 26. U.S.C. § 199; I.R.C. § 1.199-3(f), (g). Both parties, however, rely on the tax court case *ADVO, Inc. v. Commissioner*, 141 T.C. 298 (2013), which set forth the following factors to consider:

> (1) whether legal title passes; (2) how the parties treat the transaction; (3) whether an equity interest was acquired; (4) whether the contract creates a present obligation on the seller to execute and deliver a deed and a present obligation on the purchaser to make payments; (5) whether the right of possession is vested in the purchaser and which party has control of the property or process; (6) which party pays the property taxes; (7) which party bears the risk of loss or damage to the property; (8) which party receives the profits from the operation and sale of the property; and (9) whether [the non-manufacturing party] actively and extensively participated in the management and operations of the activity.

*ADVO*, 141 T.C. at 324–25; (Def.'s Mot. for Summary Judgment at 19–20; *See* Cross-Mot. at 42). The Court finds the use of these factors persuasive and will adopt them in conducting the B&BO analysis.[12]

---

[12] The *ADVO* Court noted that the factors set forth in that decision "are not the only factors that may be considered in the benefits and burdens test," and that other potentially relevant factors may be found in "Guidance for Examiners on I.R.C. § 199 Benefits and Burdens of Ownership Analysis in Contract Manufacturing Arrangements" released on February 1, 2012, by the Large Business and International Division. I.R.S. LB & I Directive, LB & I–4–0112–001 (Feb. 1, 2012). *ADVO*, 141 T.C. at 325 n.21. However, because the Court finds a genuine dispute of

As the Partnership correctly observes, the weighing of these factors in order to determine which entity bore the B&BO is a highly fact intensive inquiry that is rarely appropriate for summary judgment. (*See* Cross-Mot. at 1, 38–39; Complainant's Reply at 2 n. 2). The *ADVO* Court acknowledged several times that the B&BO analysis is highly fact intensive and made a determination after trial, rather than at the summary judgment stage. *See ADVO*, 141 T.C. at 313 n.11, 317, 320 n.17, 323 n.20, 325 n.21. The only other court that has addressed this issue likewise found that a determination of the B&BO was inappropriate at the summary judgment stage. *See Meredith Corp. v. United States*, 405 F.Supp. 3d 795, 806–09 (S.D. Iowa 2019).

In *Meredith Corp.*, a magazine publisher claimed entitlement to a § 199 deduction for its revenue from selling advertising space in its publications and selling the finished publications to customers. 405 F.Supp. 3d at 798. The publisher used contract printers[13] to print the final publications and moved for summary judgment on grounds that the publisher, rather than the printers, had the B&BO during the production process. *Id.* at 798–99. The district court found a genuine dispute of material fact as to several *ADVO* factors, which required fact finding and weighing of evidence, and therefore denied summary judgment. *Id.* at 806–09.

Here, there is a genuine dispute of material fact as to several *ADVO* factors, which precludes entry of summary judgment. In particular, there exists a genuine dispute of material fact as to how the parties treated the transaction (i.e., the intention of the parties), whether the contracts between the Partnership and Printers were fixed-price or cost-plus contracts, which party bore the risk of loss, and whether the Partnership actively and extensively participated in the management and operations of the production. (*See* Def.'s Mot. for Summary Judgment at 5, 20–22, 29–31, 24–37, 39–43, 46–50; Cross-Mot. at 4–7, 10–11, 13–17, 47–50, 51–56; Complainant's Reply at 21–24, 26–30, 32–40). As a determination of which party these factors weigh in favor of would require the weighing of evidence and credibility, this inquiry is inappropriate for resolution at the summary judgment stage. *See Meredith Corp.*, 405 F.Supp. 3d at 806–09; *Anderson*, 477 U.S. at 249 (1986). Accordingly, the United States is not entitled to summary judgment on the B&BO issue.

### IV. Conclusion

In sum, the Court finds that a genuine dispute of material fact precludes summary judgment on the issue of whether the electronic files the Partnership provided to the Printers were tangible personal property, intangible property, or computer software, for purposes of I.R.C. § 1.199-3(g)(2) and (3). Although the classification of these files is irrelevant to the section (g)(1) analysis, the Court must undertake a B&BO analysis to determine whether the Partnership's contracts with the Printers satisfy that provision. However, because there exists a genuine dispute of material fact as to certain *ADVO* factors relevant to the B&BO analysis, the Court cannot grant summary judgment on that issue. Accordingly, the United States' Motion for Summary Judgment and the Partnership's Cross-Motion for Summary Judgment are hereby

---

material fact as to the factors cited by the *ADVO* court, as explained *infra*, there is no need to consider other factors at this time.

[13] RRD was used as one of the contract printers in *Meredith*. 405 F. Supp. 3d at 798.

**DENIED**. The parties shall adhere to the schedule set forth in the Court's February 28, 2020 Pretrial Order.

    **IT IS SO ORDERED.**

s/    David A. Tapp
DAVID A. TAPP, Judge
